UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| TIMOTHY CONLEY, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. 14-288ML |
| | : | |
| COMPETITIVE TECHNOLOGIES, INC., | : | |
| CONRAD MIR, and CARL O'CONNELL, | : | |
| Defendants. | : | |

**REPORT AND RECOMMENDATION**

PATRICIA A. SULLIVAN, United States Magistrate Judge.

On June 23, 2014, Plaintiff Timothy Conley sued Defendants Competitive Technologies, Inc. ("CTI"), Conrad Mir, and Carl O'Connell for breach of a letter agreement dated May 1, 2012 ("Agreement"). The case has been bogged down by the parties' problems with representation, first for Plaintiff, and more recently for Defendants. As a result, the case has languished. It is now before the Court on the motion of Defendant CTI to vacate the default and default judgment entered against it, as well as on the motion of Plaintiff to voluntarily dismiss the individual Defendants, Mir and O'Connell, contingent on the Court's refusal to lift the default against CTI. Plaintiff seeks the latter ruling to allow the case to proceed to the entry of final judgment, terminating the matter. Both motions have been referred to me for report and recommendation.

## I.      Procedural and Factual Background

Defendant CTI[1] is a publicly traded Connecticut-based entity that appears to be in the business of selling a pain therapy medical device.[2] ECF No. 1. On May 1, 2012, Plaintiff

---

[1] On August 14, 2014, CTI changed its name from Competitive Technologies, Inc., to Calmare Therapeutics Inc. ECF No. 7 ¶ 3. CTI refers to both iterations.

entered into the Agreement with CTI, signed by its then Chief Executive Officer ("CEO"), Johnnie D. Johnson.  In its answer, CTI and the individual Defendants concede that the signed copy of the Agreement attached to the complaint is authentic.  ECF No. 7 ¶ 9.

The Agreement required Plaintiff to perform services for CTI as an independent contractor.  ECF No. 1-2 at 1 & ¶ 1.  The services consisted of maintaining CTI's government and clinical physician customer relationships, managing its nurse trainers and supervising its commissioned sales staff.  ECF No. 1-2 ¶ 2.  In consideration for these services, Plaintiff was to be paid a "fixed fee" of $11,000 per month (to increase to $12,000 if CTI got certain financing), plus commissions on his own sales.  ECF No. 1-2 ¶¶ 3-4.  While its term was two years, the Agreement provided for termination by either party on thirty days' written notice after the first twelve months, with the provision that, if CTI terminated, it would pay Plaintiff the fixed monthly fee for six additional months.  ECF No. 1-2 ¶¶ 1, 6.  The Agreement also provided that it could be renewed for successive two-year periods.  ECF No. 1-2 ¶ 1.

Based on Plaintiff's proof of claim, it would appear that Plaintiff performed the services, and CTI paid his monthly invoices, without dispute for approximately six months until the submission of the October 1, 2012, invoice, presumably in November 2012.[3]  ECF No. 31-2 at 3. Then, on November 1, 2012, Defendant Carl O'Connell became CEO of CTI, presumably replacing Johnnie Johnson, who had signed the Agreement.  ECF No. 7 ¶ 35.  According to the complaint, O'Connell "directed management to stop making payments due to Plaintiff under the Agreement."  ECF No. 1 at 4.  On September 27, 2013, O'Connell was replaced as CEO by

---

[2] The parties have provided precious little information about CTI's business.  That it sells a medical device known as the "Calmare Pain Therapy Treatment" may be derived from the Agreement.  ECF No. 1-2 at 1 ¶ 4.

[3] Both parties are remarkably vague in the pleadings, affidavits and declarations about what really happened.  For example, Plaintiff alleges only that he performed starting on May 1, 2012, and continued to do so, but CTI did not pay.  ECF No. 1 ¶¶ 19-20.  However, his proof of claim does not seek payment for the period from May 1, 2012 until October 1, 2012, permitting the inference that CTI paid him during that period.  ECF No. 31-2 at 3.

Defendant Conrad Mir, ECF No. 7 ¶ 37, who continued the same policy of "direct[ing] management to stop making payments due to Plaintiff under the Agreement."  ECF No. 1 ¶ 38. Despite not being paid anything, Plaintiff continued to do the work described in the Agreement for almost two more years.  ECF No. 1 ¶ 19.  According to the proof of claim, on September 1, 2014, Plaintiff invoiced CTI for the six-month termination fee, permitting the inference that CTI had given written notice of termination thirty days prior to that date.  ECF No. 32-2 at 4; <u>see</u> ECF No. 1-2 ¶ 6.

CTI's answer denies both the allegation that Plaintiff continued to perform the services required by the Agreement and that he was not properly compensated for the services he did provide.  ECF No. 7 ¶¶ 19-20.  One of its affirmative defenses asserts that the Agreement "was entered into *ultra vires*" but CTI provides no facts to explain the basis of that defense.  ECF No. 7 at 5 ¶ 2.  Otherwise, its answer is little beyond bland denials and boilerplate affirmative defenses.  ECF No. 7.

Plaintiff's initial prosecution of his claim did not go well.  He failed to respond to Defendants' discovery requests, ultimately resulting in a motion to default filed by the Defendants.  ECF No. 14.  However, by the time of the hearing on that first default motion, it had become clear that while his counsel had abandoned the case, Plaintiff himself had been diligent, including promptly engaging new counsel.  His new attorneys had been responsive and he promptly began to provide the discovery that his prior attorney had ignored.  Based on his diligence, CTI dropped the motion for default.  ECF No. 21.  Following a hearing, the Court found that Plaintiff's actions were beyond reproach and that an award of sanctions would be considered only against the attorney who abandoned the case; she had not even bothered to appear at the sanctions hearing.  ECF No. 21.  Defendants opted not to pursue her.

Five months after the first default motion was resolved, the worm turned.  Based on what Defendants now claim were "financial constraints," their counsel moved to withdraw on December 28, 2015.  ECF Nos. 22, 23.  His withdrawal motion was based not only on non-payment, but also on his representation to the Court that Defendants had stopped "responding to counsel's communications."  ECF No. 22 at 1.  The withdrawal motion was served on all three Defendants by regular and certified mail, and by email sent to the addresses counsel had customarily used to communicate with them.  ECF No. 22 at 2.  The withdrawal motion specifically recites that Defendants were advised of their right to object to the withdrawal motion.  ECF No. 22 at 2.  They did nothing.  The date for objection (January 14, 2016) passed without anything being filed.

The Court's response to the motion to withdraw was an Order, entered on January 22, 2016, whose content is pivotal to the motion to vacate the default judgment against CTI.  ECF No. 24.  In the Order, the Court first found that the soon-to-be former attorney's motion was in compliance with all applicable requirements and provisionally found that the motion would be granted.  ECF No. 24 at 1.  However, to protect the three Defendants from default based on any misunderstanding or failure of notice, the Court extended the time for Defendants to object and ordered that the exiting attorney could not be terminated as counsel of record until he provided an additional notice by regular mail, certified mail and email, sent to every address he had used to communicate with his soon-to-be former client.  The content of the notice was specified in the Order.  It required that Defendants clearly and unambiguously be informed that "**they are at risk that judgment of default will be entered against them**."  ECF No. 24 at 3 (emphasis in original).  The January 22, 2016, Order gave Defendants a clear, crisp deadline – the Court ordered them to object to their attorney's withdrawal, to arrange for appearance of new counsel

4

or to enter *pro se* appearances (for the individual defendants only) by March 7, 2016.  ECF No.

24 at 3.  CTI was given clear notice of its inability to appear *pro se* under the Rhode Island Local

Rules, apprising it that:

> …by Local Rule, a corporation, partnership, association or other entity is not
> permitted to appear pro se, DRI LR Gen 205(a)(3), and that such entities must
> appear through counsel or risk the entry of default, so that, if it does not object or
> engage new counsel by the deadline of March 7, 2016, **Competitive
> Technologies is at risk that judgment of default will be entered against it.**

ECF No. 24 at 5.  To further protect Defendants, the Court gave them a two-week buffer by

postponing its ruling on the motion until March 23, 2016.  ECF No. 24 at 1-2.

CTI and the individual Defendants ignored the January 22, 2016, Order; they did not

comply with it; they did nothing to acknowledge that they had even received it.  Accordingly, on

March 23, 2016, the motion to withdraw was granted.  In its Order, the Court included yet

another directive to the exiting attorney to serve his soon-to-be former clients with the Order

granting his motion to withdraw.  Text Order of Mar. 23, 2016.

At the same time that these events were unfolding, on February 5, 2016, Plaintiff filed a

motion to compel production of responses to discovery that Defendants had ignored since July

2015.  ECF No. 26.  Exiting counsel sought an extension to protect his client, which the Court

granted, again with a directive to counsel to provide special notice to his clients regarding the

importance of a timely objection to the motion to compel.  ECF No. 27; Text Order of Feb. 16,

2016.  After a delay to give Defendants ample time to address the substance of the motion to

compel, which Defendants ignored, the Court finally acted, granting the motion to compel on

March 25, 2016.  Text Order of Mar. 25, 2016.

Defendants' former attorney complied fully with the Court's Orders to ensure that

Defendants were completely and effectively advised of the schedule set by the Court to

accommodate them, and of the consequences of failing to obtain substitute counsel.  The exiting attorney filed three separate certifications, certifying that the three Orders – the Court's January 22, 2016, Order; the Order setting the deadline to object to the motion to compel; and the Order granting the motion to withdraw – were sent to the CEO (Defendant Mir) and the Chairman of the board (Peter Brennan) of CTI at its corporate address, and was sent as well as to the individual Defendants (Mir and O'Connell) at what appear to be business and home addresses, and to business (Mir) and personal (O'Connell) email accounts.  ECF Nos. 25, 28, 29.  These notices supplemented the notice sent in December 2015 when their attorney originally moved to withdraw.  ECF No. 26.

From the filing of the motion to withdraw on December 28, 2015, until March 29, 2016, when the former attorney filed the last certification in compliance with the Court's Orders, the process required by the Court to protect Defendants consumed three months.  Nevertheless, Defendants did not respond to any of the Court-ordered notices.  They ignored the warnings in the January 22, 2016, Order of the risk of default, they ignored the Court's Order that they must object or appear either through counsel or *pro se* by March 7, 2016, and they ignored both the Court's warning about the motion to compel and the resulting Order compelling production of discovery.  They did nothing.

CTI was unrepresented in violation of DRI LR Gen 205(a)(3) for less than a week before Plaintiff moved for entry of default.[4]  Because Defendants had ignored the Court's Order of January 22, 2016, no addresses had been supplied to the Clerk by the individual Defendants for service; only CTI's mailing address is in the docket.  Nevertheless, at argument, Plaintiff's counsel conceded that his motion for entry of default was served only by electronic filing.  ECF

---

[4] Plaintiff's motion for default sought judgment only as to CTI.  He has also filed a provisional motion to dismiss the individual Defendants from the case, contingent on the Court's entering the final judgment against CTI.  ECF No. 35.  That motion has also been referred to me.

No. 30 at 2.  Therefore, contrary to DRI LR Gen 205(c), Plaintiff did not mail the motion to the *pro se* individual Defendants at the addresses showing on the docket.  Defendants now claim they never were "served any physical or e-mail copy of" the motion for entry of default; however, they do not assert that they were not aware that the motion had been filed.  ECF No. 43 ¶ 10.

To afford Defendants more leniency, the Court waited for another month, well past the deadline for CTI to file an objection to the motion for entry of default.  Finally, on May 5, 2016, the motion for entry of default was granted.  By that time, almost six months had passed since Defendants' former counsel moved to withdraw, grinding any activity in the case to a halt, and three and a half months had passed since the Court's stark warning that CTI's failure to engage new counsel would result in the entry of default.  The Clerk entered default on the same day.

Plaintiff waited six more weeks before filing a motion for final judgment as to CTI.  ECF No. 31.  That motion was filed on June 21, 2016; it sought final judgment in the amount of $316,734.94, supported by a verified proof of claim signed by Plaintiff, which lists unpaid monthly invoices from October 1, 2012.  ECF No. 31-2 at 1.  Other than filing the motion and the proof of claim on the Court's ECF docket, Plaintiff made no attempt to serve CTI or the other Defendants by any other means.  ECF No. 31 at 1; ECF No. 31-1.  Accordingly, contrary to DRI LR Gen 205(c), Plaintiff did not mail the motion or proof of claim to the *pro se* individual defendants at the addresses showing on the docket.  As with the motion to default, Defendants now claim they never were "served any physical or e-mail copy of" the motion for entry of judgment or the proof of claim; however, they do not assert that they were not aware that they had been filed.  ECF No. 43 ¶ 10.

The next day – June 22, 2016 – Defendants finally acted.  On that day, new attorneys entered their appearances on behalf of all three.[5]  ECF Nos. 32, 33.  Later the same day, the motion for final judgment was granted by text order.  However, with the individual Defendants not subject to the default and no Fed. R. Civ. P. 54(b) finding that there was no just reason for CTI's delay, the clerk did not enter the final judgment.  The pending motion – to vacate the default and default judgment against CTI – was filed on June 30, 2016.  ECF No. 36.  It was supported by the Affidavit of Conrad Mir, CTI's current CEO.  ECF No. 36-1.

The Mir Affidavit has several very troubling aspects.

First and most serious, in his Affidavit, Mir disingenuously swears that because "no direction or guidelines were provided as a time frame in which new counsel was to be hired, I was unaware of any urgency as to the issue"; the Affidavit makes no reference to the Court's January 22, 2016, Order, which had provided such a time frame.  EFC No. 36-2 at 2.  Instead, Mir avers that he was aware that his counsel moved to withdraw and that, on March 23, 2016, the motion to withdraw had been granted; accordingly, he swears that he and other CTI management "were shocked" when they learned that a default application had been filed.  ECF No. 36-2 at 3.  He contends that Defendants' failures were caused by CTI's "financial constraints;" he also blames Plaintiff's failure properly to serve the motion for entry of default, the motion for final judgment and the proof of claim.  ECF No. 36-2 at 3.  The Mir Affidavit makes no mention of CTI's failure to respond to the discovery requests that had been propounded in July 2015, no mention of CTI's disregard of the Court's Order compelling compliance with these requests by April 25, 2016, and, most importantly, no mention of whether

---

[5] During oral argument on the motion to vacate the default, counsel for Defendants represented that, as far as counsel was aware, it was a coincidence that they filed their entries of appearance one day after the motion for entry of final judgment against CTI was filed.  As noted *infra*, the Court finds that the entry of CTI's new counsel within twenty-four hours of the filing of the motion for final judgment was strategic and intentional on CTI's part.  This finding applies only to CTI; I do not question the veracity of the lawyers representing CTI.

CTI received or was aware of the Court's strongly worded January 22, 2016, Order advising it of the serious risk that it would be defaulted if it remained unrepresented.

The Mir Affidavit avers that Plaintiff's claim is based on "abuse of plaintiff's relationship with prior executives of [CTI].  That in fact, plaintiff's company provided limited services to [CTI], which did not equate to hundreds of thousands of dollars."  ECF No. 36-2 at 1-2.  According to Mir, CTI disagrees with "the service and contents of any and all alleged invoices of Plaintiff."  ECF No. 36-1 at 2.  Otherwise, the Mir Affidavit simply references CTI's answer to the complaint, claiming that it contains "several affirmative and meritorious defenses."  ECF No. 36-1 at 2.  CTI points out, but presents no legal or factual context to explain, its affirmative defense of *ultra vires*.  The record is utterly devoid of any fact, plausible or not, explaining how an Agreement signed by the entity's acknowledged Chief Executive Officer, the authenticity of which is undisputed, ECF No. 7 ¶ 8, conceivably is *ultra vires*.  It must be noted that two weeks after he signed the Agreement with Plaintiff, CEO Johnson signed CTI's publically filed 10-K as its CEO.[6]  Apart from counsel's representation that some unspecified principle of Delaware law[7] will be deployed to buttress the affirmative defense of *ultra vires*, CTI has presented nothing suggesting a meritorious challenge to the viability of the Agreement.

Plaintiff's response to the motion to vacate the default asserts that CTI's claim of vague "financial constraints" is disingenuous in light of the cash listed in its most recent SEC filing.

---

[6] https://www.sec.gov/Archives/edgar/data/102198/000136086512000078/cttc10k2011.htm  (SEC Edgar filed 10K signed by Johnnie Johnson on 5/15/2012).

[7] Plaintiff invoked R.I. Gen. Laws § 7-1.2-303, which bars an entity from arguing that it lacks the capacity to act, to argue that the affirmative defense of *ultra vires* is without merit.  Defendants argue that Delaware law would control because CTI is a Delaware entity, but provide no supporting citation or explanation for its argument.  CTI's reference to Delaware law to buttress an affirmative defense of *ultra vires* makes no sense: §124 of the Delaware General Corporation Law provides that "[n]o act of a corporation and no conveyance or transfer of real or personal property to or by a corporation shall be invalid by reason of the fact that the corporation was without capacity or power to do such act or to make or receive such conveyance or transfer," except in three circumstance not applicable here (a shareholder suit, a derivative action or an action by the attorney general).  8 Del. C. 1953, § 124.

He also points to a recent case in the District of Connecticut in which CTI has seemingly engaged in similar conduct – that is, allowing counsel to withdraw and not arranging for substitute counsel until long after being ordered to do so.[8]  GEOMC Co., Ltd. v. Competitive Techs., Inc., No. 3:14-cv-01222-VAB (D. Conn. Aug. 22, 2014).  To show that the extended delay has caused him prejudice, Plaintiff adverts to the delay itself, exacerbated by the costs of the filings and hearings associated with the withdrawal of CTI's counsel and his quest to end the case and get paid for his work by procuring a final default judgment.

During the hearing on the motion to vacate the default and default judgment held on September 15, 2016, the Court asked the parties to focus on three troubling issues.

First, Defendants were asked about their failure to respond to the outstanding discovery requests; they conceded that they had continued to ignore the Court's Order compelling compliance and had provided nothing.  On behalf of CTI, counsel represented that it would fully comply as quickly as possible, in thirty days or less.  Second, Plaintiff was asked about his failure to proffer evidence of prejudice beyond delay and the cost associated with the motions and hearings culminating in the motion to vacate.  On behalf of Plaintiff, counsel represented that he had relied on the Agreement for his income and is now destitute, with his house in foreclosure.  When Plaintiff's counsel conceded that this information was not in the record, the Court made clear that consideration of such a claim of prejudice would require a sworn statement from Plaintiff himself.  Third, and most material, counsel for CTI was advised that the Court viewed the Mir Affidavit as materially inconsistent with the three certifications by its former attorney in that Mir effectively was swearing under oath that neither he nor any other CTI

---

[8] In his brief, Plaintiff also cites five recent cases in which CTI never engaged counsel, allowed default to enter and, after a long delay, finally satisfied the judgment.  ECF No. 38-1 at 4-5.  However, unlike the Connecticut District Court case, these cases seem more consistent with CTI's claim of financial constraint than with a strategy of allowing counsel to withdraw and not entering substitute counsel until the last possible moment as a delay tactic.

representative knew of the content of the January 22, 2016, Order, that they were never told of the serious risk that CTI could be defaulted, and that they were never told of the schedule set by the Court for the entry of new counsel, and for their objections to both the withdrawal of counsel and the motion to compel.

In light of the importance of these matters to the determination of whether the default judgment should be vacated, the Court set a post-briefing hearing schedule to allow Plaintiff an opportunity to present evidence of prejudice, and to allow Defendants an opportunity to present evidence to dispute the accuracy of the former attorney's certifications or otherwise to explain their failure to comply with the January 22, 2016, and March 25, 2016, Orders.  The Court advised that an evidentiary hearing would be required if the post-hearing filings raised credibility issues, including if there was a material discrepancy between the certification of the former attorney and any sworn statement CTI might submit.  The Court also advised that, if CTI failed to explain how or why it did not receive and therefore was truly unaware of the January 22, 2016, Order, the record as it then stood would result in a finding that CTI was aware of the Order and that its disregard of the Order was willful.

Neither party's post-briefing submissions resolved these problems.  Specifically, Plaintiff provided no sworn statement to buttress his counsel's representation about prejudice.  And Mir's new Declaration simply repeats the averment from his Affidavit that CTI's inaction in March 2016 was due to "liquidity and financial issues" and states that a misunderstanding caused it to default on its discovery obligations.  ECF No. 43 ¶¶ 3-4.  Otherwise, Mir focuses on the Plaintiff's failure properly to serve the motion for default, the motion for entry of final judgment and the proof of claim, ECF No. 43 ¶ 10, but is silent on whether he, O'Connell or CTI's Chairman Brennan received actual notice of the January 22, 2016, Order and, if they did, why

they ignored its mandates.  Finally, Plaintiff's final post-hearing brief advised that discovery had

yet to be provided as of October 27, 2016 – almost two weeks after CTI's counsel represented to

the Court during oral argument that it would comply, and six months after the Court-ordered

deadline.

## II.    Standard of Review

Because the music stopped with the granting of the motion for final judgment, and the

Clerk did not take the final step of entering final judgment in favor of Plaintiff pursuant to Fed.

R. Civ. P. 54(b) and Fed. R. Civ. P. 58, the decision to set aside both the default and a non-final

default judgment against CTI is governed by the "good cause" standard set out in Fed. R. Civ. P.

55(c).[9]  "The burden of demonstrating good cause lies with the party seeking to set aside the

default."  Viera v. P.A.R.I. Indep. Living Ctr., Inc., No. CA 13-769-S, 2014 WL 1478696, at *1

(D.R.I. Apr. 15, 2014).  The analysis must be guided by the fundamental "philosophy that

actions should ordinarily be resolved on their merits."  Barrepski v. Capital One Bank, 439 F.

App'x 11, 12 (1st Cir. 2011).

While "[t]here is no mechanical formula for determining whether good cause exists and

courts may consider a host of relevant factors," courts typically consider: (1) whether the default

was willful; (2) whether setting it aside would prejudice the adversary; and (3) whether a

meritorious defense is presented.  Other factors include: (4) the nature of the defendant's

explanation for the default; (5) the good faith of the parties; (6) the amount of money involved;

---

[9] The parties dispute which Federal Rule governs the motion to vacate.  Plaintiff argues that the stricter standard in Fed. R. Civ. P. 60 is applicable because the Court granted the motion for final judgment.  The cases, however, are clear – until the last act is taken and the judgment is final and appealable, Fed. R. Civ. P. 55(c) is the controlling rule.  See Fed. Deposit Ins. Corp. v. Francisco Inv. Corp., 873 F.2d 474, 478 (1st Cir. 1989).  Here, with the default and final judgment applicable to fewer than all of the defendants, the Clerk had not yet entered final judgment, even though the motion for entry of final judgment as to CTI had been granted.  Fed. R. Civ. P. 54(b); Fed. R. Civ. P. 58; see Diaz-Reyes v. Fuentes-Ortiz, 471 F.3d 299, 301 (1st Cir. 2006) (final judgment requires "clear and unequivocal manifestation by the district court of its belief that the decision made, so far as the court is concerned, in the end of the case").

and (7) the timing of the motion.  Indigo America, Inc. v. Big Impressions, LLC, 597 F.3d 1, 3

(1st Cir. 2010); Viera v. P.A.R.I. Indep. Living Ctr., Inc., 2014 WL 1478696, at *1.  "The trial

judge, who is usually the person most familiar with the circumstances of the case and is in the

best position to evaluate the good faith and credibility of the parties, is entrusted with the task of

balancing these competing considerations."  KPS & Assocs., Inc. v. Designs By FMC, Inc., 318

F.3d 1, 13 (1st Cir. 2003) (quoting Eagle Assocs. v. Bank of Montreal, 926 F.2d 1305, 1307 (2d

Cir. 1991)).

        The first factor – willfulness – depends on the intentionality of the conduct that resulted

in the default, consistent with the "inherent power [of courts] to dismiss an action when a party

has willfully deceived the court and engaged in conduct utterly inconsistent with the orderly

administration of justice."  Aoude v. Mobil Oil Corp., 892 F.2d 1115, 1119 (1st Cir. 1989).

Thus, in Viera v. P.A.R.I. Indep. Living Ctr., Inc., the defendant sustained his burden of showing

that his failure to answer was not willful by demonstrating that service occurred just as he

returned from having had surgery, and that he attempted to answer promptly as soon as his error

was brought to his attention.  2014 WL 1478696, at *1-2.  A court may decline to make a finding

of willfulness when evidence of inadvertence is well grounded in facts, the defenses are

meritorious and there is no evidence of prejudice.  Acree v. Republic of Iraq, 658 F. Supp. 2d

124, 129-30 (D.D.C. 2009) (inaction resulting in default blamed on war, reconstruction and

governmental reorganization).  On the other hand, a finding that the defendant deliberately

ignored service and lied when asked under oath if he had been served more than justifies the

conclusion that the conduct was willful.  Hekking v. Hekking, C.A. No. 14-295-ML, slip op. at

14-15 (D.R.I. Sept. 17, 2014) (hereinafter cited as "Hekking").  Further, when a party has

engaged in willful misconduct, deceived the court and ignored the court's orders, the court may

exercise its "plenary authority 'to manage [its] own affairs so as to achieve the orderly and expeditious disposition of cases," by exercising its discretion to refuse to set aside the default. KPS & Assocs., Inc., 318 F.3d at 15.

The second factor is whether the party seeking default judgment has demonstrated that he would suffer prejudice were the default to be set aside.  Merely "requir[ing] the [plaintiff] to litigate the action is insufficient prejudice to require the default decree to stand." United States v. One Parcel of Real Prop., 763 F.2d 181, 183 (5th Cir. 1985).  Indeed, "[e]arly in the case, as when a default has been entered but no judgment proven, a liberal approach is least likely to cause unfair prejudice to the nonmovant." Coon v. Grenier, 867 F.2d 73, 76 (1st Cir.1989). Moreover, delay in and of itself does not constitute prejudice; rather, the question is whether the delay has resulted in the loss of evidence, increased difficulties of discovery, or an enhanced opportunity for fraud or collusion." KPS & Assocs., Inc., 318 F.3d at 15; FDIC v. Francisco Inv. Corp., 873 F.2d 474, 479 (1st Cir. 1989).  Particularly when the delay is brief and the default was entered at the earliest stage of the case, courts will not find that undue prejudice would be occasioned by the removal of the default in the absence of affirmative evidence of concrete injury. Hekking, at 16.  Further, with no prejudice and only a short delay, but extremely serious willfulness, including conduct that amounts to perjury, the court may vacate the default and instead impose a monetary sanction to compensate the plaintiff for the expense of litigating the motion. Hekking, at 18.

The third of the factors – assessing whether the party seeking to vacate an entry of default has presented a meritorious defense – requires the court to evaluate the plausibility of the defaulter's defenses. See Viera, 2014 WL 1478696, at * 1-2.  Typically, the bar for establishing a meritorious defense is set very low.  The mere assertion of denials in the answer is generally

14

found to be sufficient: "[u]nder the standards for vacating default in this Circuit, a defense is
meritorious if it 'contain[s] even a hint of a suggestion' which, proven at trial, would constitute a
complete defense." Acree v. Republic of Iraq, 658 F. Supp. 2d at 129; Hekking, at 15-16.  On
the other hand, a defense so flimsy that the litigant seems to be "stonewalling" to postpone the
inevitable may justify leaving the default in place.  KPS & Assocs., Inc., 318 F.3d at 14-15.

**III.**   **Analysis**

      In this case, I find that CTI was served with copies of the three Orders, as stated in the
uncontroverted certifications of its former counsel; I also find that CTI was served with the
original motion to withdraw filed in December 2015.  In making these findings, I rely on CTI's
silence, which is glaring in the face of the Court's warning that a finding of willfulness would
flow from the absence of a credible explanation for the inconsistency between the attorney
certification and the Mir averment that CTI was never given a schedule or deadline to bring in
new counsel and was "shocked" by the default motion.  To be specific, I find that CTI received
and was aware of the January 22, 2016, Order that required it to arrange for substitute counsel by
March 7, 2016, or face default; that CTI received and was aware of the February 2016, Order
allowing it additional time to object to the motion to compel; and that CTI received and was
aware of the March 23, 2016, Order allowing its counsel to withdraw.  I further find that CTI
intentionally ignored the January 22, 2016, Order, and that it did so strategically, in the
expectation that the resultant delay might improve its position with respect to this case.

      Relatedly, I find that CTI's excuse of "financial constraints" rings hollow – the Court's
January 22, 2016, Order alerted CTI and the individual Defendants to their right to object to their
attorney's withdrawal by March 7, 2016.  Such a filing does not require financial liquidity; an
objection that raised financial issues as a reason for needing more time to procure new counsel

would have received careful consideration.  Even more hollow is CTI's plaint that Plaintiff should be blamed for CTI's failure to comply with the January 22, 2016, Order because he did not serve the individual Defendants properly with the motion to default and motion for final judgment.  Finally, I find that it was no coincidence that CTI ignored the clear warnings in the January 22, 2016, Order, continuously from the day they received the Order right up until one day after the judgment for entry of final judgment was filed.  Such a just-in-time action, exquisitely timed to occur at the last possible moment, when examined in light of CTI's full knowledge that it was flirting with default by its inaction, permits a strong inference of an intentional act.

Based on the foregoing, the first Fed. R. Civ. P. 55(c) factor – willfulness – tips strongly in favor of leaving the default in place.  These findings also implicate fourth, fifth and seventh factors (the nature of the explanation, the good faith of the parties and the timing of the motion), all of which tip in favor of allowing the default to stand.

The second factor – prejudice – tips in the opposite direction.  Despite the Court's clear warning that a representation of counsel was not sufficient, Plaintiff has failed to show any concrete prejudice, other than the delay itself.  Nevertheless, the Court also may consider that, in this instance, the length of the delay is substantial.  Because this Court bent over backwards to protect the Defendants from the consequences of finding themselves unrepresented, this case has effectively been on hold since the filing of the motion to withdraw on December 28, 2015, that is, for almost a year.  This is significantly longer than the delays that courts have brushed aside in removing default.  Barrepski v. Capital One Bank, 439 F. App'x at 12 (delay of less than two weeks; affirming vacatur of default); Hekking, at 16 (delay of less than two weeks; default vacated); Viera, 2014 WL 1478696, at *1-2  (delay of mere two weeks; default vacated).

The last of the three Fed. R. Civ. P. 55(c) factors – the merits of CTI's defenses – yields a mixed result.  CTI claim that it is not liable for breaching the Agreement is almost frivolous.  In its answer, CTI authenticates the Agreement as a contract signed by its then-CEO.  Its affirmative defense of *ultra vires*, on which it carries the burden, is utterly without content.[10] CTI does not assert that the Agreement does not exist or that it fully performed all of its obligations – rather, it focuses on the "abuse of plaintiff's relationship with prior executives of [CTI]."  It acknowledges that "plaintiff's company provided limited services to [CTI]," arguing only that they "did not equate to hundreds of thousands of dollars."  ECF No. 36-2 at 1-2.  As the Mir Affidavit asserts, it is "the service and contents of any and all alleged invoices of Plaintiff" with which CTI disagrees.  ECF No. 36-2 ¶ 3.  Thus, it seems plain that CTI is stonewalling.  See KPS & Assocs., Inc., 318 F.3d at 14-15.

On the other hand, CTI's defense that disputes the amount owed under the Agreement has sufficient merit to reach the Fed. R. Civ. P. 55(c) threshold.  Consistently, Plaintiff's proof of claim raises the troubling question why he continued to work for two years when CTI was in breach of its duty to pay.  Consequently, CTI's denial that it now owes the amount in Plaintiff's proof of claim amount to a meritorious defense.  In addition, the substantial sum laid out in the proof of claim implicates the sixth Fed. R. Civ. P. 55(c) factor (the amount of money involved), tipping the determination of the amount of damages in favor of vacating the default.

Balancing these factors leads me to a Solomonic recommendation.  With such serious and troubling willfulness by CTI, including blatant disregard of an Order of the Court and a false sworn statement regarding its conduct, coupled with a long delay caused by the Court's effort

---

[10] CTI's reference to Delaware law makes no sense: §124 of the Delaware General Corporation Law provides that "No act of a corporation and no conveyance or transfer of real or personal property to or by a corporation shall be invalid by reason of the fact that the corporation was without capacity or power to do such act or to make or receive such conveyance or transfer," except in three circumstance not applicable here (a shareholder suit, a derivative action or an action by the attorney general).  8 Del. C. 1953, § 124.

(stymied by CTI's obduracy) to protect Defendants when their counsel withdrew, and the utter

lack of merit of CTI's contention that it is not liable for breach of the Agreement, I recommend

that the motion to vacate be denied as to default on liability only.  On the other hand, because

CTU has a meritorious defense concerning the amount it under the Agreement, along with the

substantial sum that Plaintiff seeks in his proof of claim, and mindful of the strong preference for

judgment on the merits, I recommend that the motion to vacate the default be granted as to the

amount of damages.

**IV.    Conclusion**

Based on the foregoing, I recommend that the motion to vacate (ECF No. 36) be granted

in part and denied in part.  Specifically, I recommend that the Court leave the default judgment

as to liability in place, but vacate the default as to the amount of damages.  Because I am not

recommending that the final judgment of default against CTI be left in place, I also recommend

that Plaintiff's contingent motion to voluntarily dismiss the individual Defendants (ECF No. 35)

be denied without prejudice.

Any objection to this report and recommendation must be specific and must be served

and filed with the Clerk of the Court within fourteen (14) days after its service on the objecting

party.  See Fed. R. Civ. P. 72(b)(2); DRI LR Cv 72(d).  Failure to file specific objections in a

timely manner constitutes waiver of the right to review by the district judge and the right to

appeal the Court's decision.  See United States v. Lugo Guerrero, 524 F.3d 5, 14 (1st Cir. 2008);

Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).


/s/ Patricia A. Sullivan
PATRICIA A. SULLIVAN
United States Magistrate Judge
November 21, 2016